# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. *2009· 04562-C*

*THOMAS ROBERTS* , Plaintiff(s)

v.

*Philip Gordon, Esq ET AL* , Defendant(s)

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon *DAVID RUSSMAN,
Russman Law Firm PC*
plaintiff's attorney, whose address is *33 Bellevue ST, STE 1, Boston MA 02205,* an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Barbara J. Rouse, Esquire, at Boston, the _____ *30* _____ day of _____ *December* _____, in the year of our Lord two thousand _____ *10* _____.

A true copy Attest:

*1·10-11* Deputy Sheriff Suffolk County

*Michael Joseph Donovan*

Clerk/Magistrate

NOTE: *You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.*

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF— (5) OTHER
FORM CIV.P. 1 3rd Rev. 10M - 11/10

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
C.A. No. 2009-04562-C

|  |  |
|---|---|
| THOMAS ROBERTS<br>    Plaintiff<br><br>v.<br><br>ABU TAREK,<br>PHILIP GORDON, ESQ.<br>ARA BALIKIAN, ESQ.<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AMENDED COMPLAINT**

## Parties

1.     The Plaintiff, Thomas Roberts ("Roberts") is a natural person who resides at 220 Summit Blvd, Apt. 221, Broomfield, CO.

2.     The Defendant, Abu Tarek ("Tarek"), is a natural person with a last known address at 402 Rindge Avenue, Cambridge, MA.

3.     The Defendant, Philip Gordon, Esq. ("Gordon") is an attorney licensed to practice in Massachusetts with a principal place of business at the Gordon Law Group, LLP, 585 Boylston Street, Boston, MA.

4.     The Defendant, Ara Balikian, Esq. ("Balikian") is an attorney licensed to practice in Massachusetts with a principal place of business at Balikian Law, 922 Waltham Street, Suite 209, Lexington, MA.

## Jurisdiction and Venue

5.     Jurisdiction is conferred upon this Court, pursuant to M.G.L. c. 223A, §§2 and 3.  Venue is properly laid in Suffolk County pursuant to M.G.L. c. 223, §1, *et seq.*

## Facts

6.     On or about September 29, 2003, Tarek, owned a condominium unit at 10 Jamaicaway, Unit 11, Jamaica Plain, MA (the "Condominium Unit").  At that time, Tarek granted a mortgage on the Condominium Unit to Argent Mortgage Company ("Tarek's

Mortgagee") in the amount of $178,125.00 (hereinafter, the "Mortgage"). (See a true and accurate coy of the Mortgage at **Exhibit A**).

7.    In or around early February 2004, Roberts sought to purchase a home that was situated near his place of employment. On or about February 11, 2004, Roberts executed an Offer to Purchase (the "Offer to Purchase") the Condominium Unit for a total purchase price of $243,000, the approximate market value of the property at the time, and Tarek accepted the Offer to Purchase. (See a true and accurate copy of the Offer to Purchase at **Exhibit B**).

8.    Upon information and belief, at all relevant times, Gordon and Balikian, then of Gordon & Balikian, LLP, served as counsel to Tarek with regard to the conveyance of the Condominium Unit from Tarek to Roberts. Roberts was not represented by counsel.

9.    At the time, unbeknownst to Roberts, the Condominium Unit was encumbered by the Mortgage. Nothing in the Offer to Purchase or Tarek's acceptance thereof demonstrated that Roberts was offering to pay not only $243,000 for the Condominium Unit, but also to assume and/or to be responsible for, the Mortgage.

10.    On February 13, 2004, Roberts and a Prudential Unlimited Realty salesperson named Jean-Paul LaPierre, who was Tarek's real estate agent ("Tarek's Realtor"), executed a document acknowledging that Roberts had elected not to use an attorney with regard to reviewing binding legal documents. (See a true and accurate copy of the document at **Exhibit C**). The document further provided that "[t]he buyer agrees to hold the real estate salesperson and their firm harmless from any and all damages that could have been avoided if the buyer used professional representation in the negotiation of the Purchase and Sale Agreement." Despite this language, as a general rule, a party may not contract away a fraud claim.

11.    On or about February 18, 2004, Roberts and Tarek executed a Purchase and Sale Agreement ("P&S Agreement") pertaining to Roberts' purchase of the Condominium Unit for a total purchase price of $243,000. (See a true and accurate copy of the P&S Agreement at **Exhibit D**). Paragraph 4 of the P&S Agreement provided that Tarek was to convey the Condominium Unit to Roberts "free from encumbrances," with certain exceptions not relevant here. Paragraph 14 provided that Tarek may, at the time of the delivery of the deed, use the proceeds of the sale to clear the title of encumbrances, such as a mortgage.

12.    The P&S Agreement also contained several Riders drafted by Gordon and/or Balikian. Paragraph 34 provided that Roberts elected not to perform an inspection, and that he was buying the Condominium Unit "as is." Paragraph 35 provided that Roberts was purchasing the rights, title and interests that Tarek had in the Condominium Unit. Paragraphs 34 and 35 did not, in any way, negate the representation in Paragraph 4 that Tarek would convey the Condominium Unit to Roberts free from all encumbrances. Nothing in the P&S Agreement disclosed the existence of any mortgage

2

on the Condominium Unit, and, at no time before the closing on the Condominium Unit did Tarek, Tarek's Realtor, Gordon or Balikian reveal the existence of any mortgage on the Condominium Unit.

13.     In advance of the closing, Tarek's Realtor told Roberts that a title search had been performed on the Condominium Unit. Based upon Tarek's Realtor's representation, Roberts reasonably believed that there was no mortgage on the Condominium Unit, or, to the extent that a mortgage did exist, that the mortgage would be paid off at the closing.

14.     On February 20, 2004, two days after the signing of the P&S Agreement, Roberts attended the real estate closing pertaining to his purchase of the Condominium Unit. At the closing, Gordon and/or Balikian presented Roberts with a letter dated February 20, 2004. (See a true and accurate copy of the letter at **Exhibit E**). The letter does not refer to the P&S Agreement, and it is signed by Balikian (and not by Tarek); as a result, the letter is not a supplement to, nor may it be incorporated into, the P&S Agreement. The letter confirmed that Gordon and Balikian represented Tarek and not Roberts. The letter provided that Tarek, his agents and Gordon and Balikian had made no representations regarding the title or any fees relating to the Condominium Unit, and that Roberts was not relying upon any such representations. The letter provided, "[y]ou agree that you are purchasing the Property in its 'AS IS' condition without, among other things, an inspection of the Property or a prior survey of or review of the title to the Property." The letter also included language to suggest that Roberts was releasing Tarek and Gordon and Balikian from any claims relating to the transaction and that Roberts agreed to indemnify Tarek and Gordon and Balikian against "any and all loss, costs or damages, including but not limited to reasonable attorneys [*sic*] fees, arising from this transaction."

15.     At no time did Gordon and/or Balikian afford Roberts an opportunity to consult with counsel before signing the February 20, 2004 letter (since the letter was first presented to Roberts at the closing), and at no time did Gordon and/or Balikian recommend that Roberts seek counsel before signing the document. Roberts, without the benefit of counsel, executed the letter during the course of the closing.

16.     At or around the time of the closing, Tarek executed a Quitclaim Deed (the "Quitclaim Deed") conveying the Condominium Unit to Roberts, and Gordon and/or Balikian notarized Tarek's signature. (See a true and accurate copy of the Quitclaim Deed at **Exhibit F**). In the Quitclaim Deed, the "full consideration" was recited as $243,000, not approximately $421,000. Having already paid an initial deposit of $11,000, Roberts paid the balance of approximately $232,000 in cash at the closing. Nothing in the Quitclaim Deed identifies the Mortgage, or lists the bank involved. Nothing in the Quitclaim Deed states that Roberts would assume any mortgage on the Condominium Unit as a part of the conveyance.

17.     At no time did Roberts execute any documents for Tarek's Mortgagee, or for any other entity or individual, in which he agreed to assume responsibility for the Mortgage.

18.     Moreover, Tarek conveyed the property to Roberts pursuant to a Quitclaim Deed, and in doing so Tarek covenanted that at the time of delivery of the deed, the Condominium Unit was free from all encumbrances made by Tarek and Tarek warranted and agreed to defend the Condominium Unit against lawful claims and demands claiming by, through or under Tarek.  In other words, by conveying the Condominium Unit pursuant to a Quitclaim Deed, Tarek warranted to Roberts that the Condominium Unit was free and clear.  That was not the case.

19.     At no time following the closing did Tarek or Gordon or Balikian take any steps to discharge and/or to pay off the Mortgage.  As a result, Tarek received not only the $243,000 in cash provided by Roberts, he also wrongfully walked away from an obligation to pay a Mortgage in the amount of approximately $178,000.

20.     The U.S. Department of Housing and Urban Development Settlement Statement (the "HUD-1") reveals that Gordon and Balikian served as the settlement agent with regard to the conveyance of the Property. (See a true and accurate coy of the HUD-1 at **Exhibit G**, which copy is not executed by Tarek's Counsel).  The settlement agent is charged with the responsibility of making the necessary disbursements from the proceeds of the closing.  In that role, the settlement agent routinely inquires about whether there is a mortgage payoff so as to be prepared to make any necessary payments.  In Lines 203 and 503 of the HUD-1, the settlement agent identifies any existing loans that the property was taken "subject to."  Here, those spaces are left blank on the HUD-1, thus demonstrating (1) that Roberts was not assuming any mortgage and (2), erroneously, that there was no outstanding mortgage at the time of the closing.  Nothing on the HUD-1 gave Roberts any notice whatsoever that there was a mortgage remaining on the property.

21.     After purchasing the Condominium Unit, Roberts paid thousands of dollars in condominium fees, and he invested tens of thousands of dollars in renovations to the Condominium Unit over the next several years.

22.     On September 24, 2007, more than three years after Roberts purchased the Condominium Unit, Tarek's Mortgagee assigned the Mortgage to Deutsche Bank National Trust Co. ("Deutsche Bank").  (See a true and accurate copy of Assignment at **Exhibit H**).

23.     Shortly thereafter, unbeknownst to Roberts, Deutsche Bank initiated foreclosure proceedings pertaining to the Condominium Unit.  On or about March 11, 2008, unbeknownst to Roberts, the Land Court (Sheier, J.) entered a judgment in a Complaint to Foreclose Mortgage (Docket No. 07 MISC 361107) permitting Deutsche Bank to enter and to sell the Condominium Unit in accordance with the powers set forth in the Mortgage.  (See a true and accurate copy of the Land Court judgment **Exhibit I**).

24.     On or about March 13, 2008, unbeknownst to Roberts, Deutsche Bank conducted a foreclosure sale on the Condominium Unit (the "Foreclosure Sale"). In a Certificate of Entry dated March 13, 2008, unbeknownst to Roberts, Deutsche Bank gave notice that it had made entry on the Condominium Unit for the purposes of foreclosing the Mortgage. (See true and accurate copy of Certificate of Entry at **Exhibit J**). In the Certificate of Entry, Deutsche Bank expressly mentions Tarek, but nowhere in the document does Deutsche Bank refer to Roberts, further demonstrating that the Mortgage remained Tarek's obligation.

25.     On May 13, 2008, unbeknownst to Roberts, a Foreclosure Deed was recorded in the Suffolk County Registry of Deeds (Book 43527, Page 1) in which Deutsche Bank claimed to have acquired the Condominium Unit under the terms of the Mortgage for the sum of $199,393.27. (See a true and accurate copy of the Foreclosure Deed at **Exhibit K**). At no time has Roberts received any funds representing any surplus from the Foreclosure Sale.

26.     Roberts had rented the Condominium Unit to two lessees, beginning in or about August or September 2006. In or about May 2008, Roberts received a telephone call from one of his tenants, Vignoble Sylvestre, where Sylvestre informed Roberts that Sylvestre had received a certified letter from a bank stating that the bank now owned the Condominium Unit and ordering the lessees to vacate the Condominium Unit. At the time, Roberts had no knowledge whatsoever of the existence of any mortgage on the property. Roberts performed some internet research and located an address in Jamaica Plain for 10 Jamaica Plain Court. Roberts told Sylvestre, in words or substance, not to worry about the letter, because the letter must relate to the 10 Jamaica Plain Court property, and not to the Condominium Unit. That communication from Sylvestre represented the first notice that Roberts had, from any source, that anyone claimed, rightfully or wrongfully, that there was a mortgage of any kind on the Condominium Unit.

## Count I
## Breach of Contract Against Tarek

27.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 26 above, as if restated in their entirety here.

28.     The P&S Agreement was a binding contract, and pursuant to it, Tarek was obligated to convey the Condominium Unit free and clear of all encumbrances.

29.     Roberts fully performed under the P&S Agreement.

30.     Tarek breached the P&S Agreement by failing to convey the Condominium Unit free and clear of all encumbrances and by breaching the covenant of good faith and fair dealing.

31.    As a result of Tarek's breach of the P&S Agreement, Roberts has been damaged.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, plus interest, costs and attorneys fees.

## Count II
### Intentional Misrepresentation Against Tarek

32.    Roberts repeats and realleges the allegations contained in paragraphs 1 through 31 above, as if restated in their entirety here.

33.    Tarek and his agents intentionally made material misrepresentations regarding the Condominium Unit and the Mortgage intending that Roberts rely upon those material misrepresentations. Tarek and his agents intentionally misrepresented that the Condominium Unit was unencumbered or that if it was encumbered that it would be conveyed to Roberts free and clear of all encumbrances.

34.    Roberts reasonably relied to his detriment upon the material misrepresentations made by Tarek and his agents regarding the Condominium Unit and the Mortgage.

35.    As a result of Tarek's intentional misrepresentations, Roberts has been damaged.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, plus interest, costs and attorneys fees.

## Count III
### Negligent Misrepresentation Against Tarek

36.    Roberts repeats and realleges the allegations contained in paragraphs 1 through 35 above, as if restated in their entirety here.

37.    Tarek owed a duty to Roberts as the seller of the Condominium Unit.

38.    Tarek and his agents breached that duty by negligently making material misrepresentations regarding the Condominium Unit and the Mortgage intending that Roberts rely upon those material misrepresentations. Tarek and his agents negligently misrepresented that the Condominium Unit was unencumbered or that if it was encumbered that it would be conveyed to Roberts free and clear of all encumbrances.

39.    Roberts reasonably relied to his detriment upon the material misrepresentations made by Tarek and his agents regarding the Condominium Unit and the Mortgage.

40. As a result of Tarek's negligent misrepresentations, Roberts has been damaged.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, plus interest, costs and attorneys fees.

**Count IV**
**Violation of Mass. Gen. Laws Ch. 183, Sections 11 and 17 Against Tarek**

41. Roberts repeats and realleges the allegations contained in paragraphs 1 through 40 above, as if restated in their entirety here.

42. Tarek conveyed the Condominium Unit to Roberts pursuant to a Quitclaim Deed, and in doing so Tarek covenanted that at the time of delivery of the deed, the Condominium Unit was free from all encumbrances made by Tarek.

43. Tarek conveyed the property to Roberts pursuant to a Quitclaim Deed, and in doing so Tarek warranted and agreed to defend the Condominium Unit against lawful claims and demands claiming by, through or under Tarek.

44. Tarek conveyed the property to Roberts pursuant to a Quitclaim Deed, and in doing so Tarek warranted to Roberts that the Condominium Unit was free and clear.

45. Roberts reasonably relied upon the warranties made to him by Tarek in the Quitclaim Deed.

46. The Condominium Unit was not free and clear but rather was encumbered by the Mortgage. Thus, Tarek breached the warranties provided in the Quitclaim Deed, and Roberts has been damaged as a result.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, plus interest, costs and attorneys fees.

**Count V**
**Intentional Misrepresentation Against Gordon**

47. Roberts repeats and realleges the allegations contained in paragraphs 1 through 46 above, as if restated in their entirety here.

48. Gordon intentionally made material misrepresentations regarding the Condominium Unit and the Mortgage (including but not limited to in the HUD-1) intending that Roberts rely upon those material misrepresentations. Via at least the HUD-1, Gordon intentionally misrepresented that the Condominium Unit was unencumbered or that if it was encumbered that it would be conveyed to Roberts free and clear of all encumbrances.

49.     Roberts reasonably relied to his detriment upon the material misrepresentations made by Gordon regarding the Condominium Unit and the Mortgage.

50.     As a result of Gordon's intentional misrepresentations, Roberts has been damaged.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, plus interest, costs and attorneys fees.

### Count VI
### Negligent Misrepresentation Against Gordon

51.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 50 above, as if restated in their entirety here.

52.     As the settlement agent, Gordon owed a duty to Roberts.

53.     Gordon breached that duty by negligently making material misrepresentations regarding the Condominium Unit and the Mortgage (including but not limited to in the HUD-1) intending that Roberts rely upon those material misrepresentations.  Via at least the HUD-1, Gordon negligently misrepresented that the Condominium Unit was unencumbered or that if it was encumbered that it would be conveyed to Roberts free and clear of all encumbrances.

54.     Roberts reasonably relied to his detriment upon the material misrepresentations made by Gordon (via at least the HUD-1) regarding the Condominium Unit and the Mortgage.

55.     As a result of Gordon's negligent misrepresentations, Roberts has been damaged.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, plus interest, costs and attorneys fees.

### Count VII
### Violation of Massachusetts General Laws Chapter 93A Against Gordon

56.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 55 above, as if restated in their entirety here.

57.     As a practicing lawyer, Gordon is engaged in trade or commerce in Massachusetts.

58.     Gordon acted unfairly and deceptively by, among other things, intentionally making material misrepresentations regarding the Condominium Unit and

the Mortgage (including but not limited to in the HUD-1) intending that Roberts rely upon those material misrepresentations.

59.     On or about April 16, 2009, Roberts sent a demand letter to Gordon pursuant to Chapter 93A, demanding that Gordon provide a reasonable settlement offer. Gordon refused to provide one.

60.     As a result of Gordon's actions, Roberts has been damaged.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, trebled, plus interest, costs and attorneys fees.

**Count V**
**Intentional Misrepresentation Against Balikian**

61.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 60 above, as if restated in their entirety here.

62.     Balikian intentionally made material misrepresentations regarding the Condominium Unit and the Mortgage (including but not limited to in the HUD-1) intending that Roberts rely upon those material misrepresentations.  Via at least the HUD-1, Balikian intentionally misrepresented that the Condominium Unit was unencumbered or that if it was encumbered that it would be conveyed to Roberts free and clear of all encumbrances.

63.     Roberts reasonably relied to his detriment upon the material misrepresentations made by Balikian regarding the Condominium Unit and the Mortgage.

64.     As a result of Balikian's intentional misrepresentations, Roberts has been damaged.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, plus interest, costs and attorneys fees.

**Count VI**
**Negligent Misrepresentation Against Balikian**

65.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 64 above, as if restated in their entirety here.

66.     As the settlement agent, Balikian owed a duty to Roberts.

67.     Balikian breached that duty by negligently making material misrepresentations regarding the Condominium Unit and the Mortgage (including but not limited to in the HUD-1) intending that Roberts rely upon those material

misrepresentations. Via at least the HUD-1, Balikian negligently misrepresented that the Condominium Unit was unencumbered or that if it was encumbered that it would be conveyed to Roberts free and clear of all encumbrances.

68.     Roberts reasonably relied to his detriment upon the material misrepresentations made by Balikian (via at least the HUD-1) regarding the Condominium Unit and the Mortgage.

69.     As a result of Balikian's negligent misrepresentations, Roberts has been damaged.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, plus interest, costs and attorneys fees.

## Count VII
### Violation of Massachusetts General Laws Chapter 93A Against Balikian

70.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 69 above, as if restated in their entirety here.

71.     As a practicing lawyer, Balikian is engaged in trade or commerce in Massachusetts.

72.     Balikian acted unfairly and deceptively by, among other things, intentionally making material misrepresentations regarding the Condominium Unit and the Mortgage (including but not limited to in the HUD-1) intending that Roberts rely upon those material misrepresentations.

73.     On or about April 16, 2009, Roberts sent a demand letter to Balikian pursuant to Chapter 93A, demanding that Balikian provide a reasonable settlement offer. Balikian refused to provide one.

74.     As a result of Balikian's actions, Roberts has been damaged.

**Wherefore,** Roberts respectfully requests that judgment enter in his favor on this count in an amount to be determined at trial, trebled, plus interest, costs and attorneys fees.

**Jury Demand**

Plaintiff, Thomas Roberts, respectfully requests a jury trial on all issues so triable.

Respectfully submitted,
THOMAS ROBERTS
By his attorneys,

David P. Russman (BBO 567796)
The Russman Law Firm, P.C.
33 Bellevue Street, Suite One
Boston, MA  02125
T. 617.282.5300
F. 617.282.5301
drussman@russmanlawfirm.com

Dated: December 29, 2010

**Exhibit A**

02005⁶⁷ 149

Return To:

Argent Mortgage Company, LLC
P.O. Box 14130,
Orange, CA 92863-1530

SUFFOLK REGISTRY
...Y ...TE A EXAM ATTEST

2003 SEP 30  PH 1: 39

718

REGISTER OF DEEDS

Prepared By: Argent Mortgage Company, LLC

Robert Jonas
333 Westchester Avenue, 1st
Floor, White Plains, NY 10604

—————————[Space Above This Line For Recording Data]—————————

# MORTGAGE



09/30/2003 Doc: 0718

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated September 29, 2003
together with all Riders to this document.
**(B) "Borrower"** is ABU TAREK

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is Argent Mortgage Company, LLC

Lender is a Corporation
organized and existing under the laws of Delaware

0053269411 - 9603

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3022  1/01

VMP -6(MA) (0005)

Page 1 of 15          Initials:_____          09/26/2003 3:55:08 PM

VMP MORTGAGE FORMS - (800)521-7291

150          TARAMARK
Bra...          ...d Suite 305
(781) 30...-0...

TARAMARK

A T

32905   159

Lender's address is One City Boulevard West  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated September 29, 2003
The Note states that Borrower owes Lender one hundred seventy-eight thousand one
hundred twenty-five and 00/100                                                                    Dollars
(U.S. $178,125.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than October 1, 2033

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [X] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

0053269411-9603

Initials:

-6(MA) (0005)          Page 2 of 15     09/26/2003 3:55:08     Form 3022   1/01

A-T

32?05   151

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County                                                                            [Type of Recording Jurisdiction]
of SUFFOLK                                                    [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF:

Parcel ID Number: WARD 10 PARCEL 01612                which currently has the address of
10 JAMAICA WAY                                                                              [Street]
JAMAICA PLAIN                                        [City] , Massachusetts 02130 ✓     [Zip Code]
("Property Address"):

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
     UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
     1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

0053269411 -9603
Initials:_____

-6(MA) (0005)                        Page 3 of 15 09/26/2003 3:55:08 PM  Form 3022  1/01

A·T

32905   152

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

0053269411 - 9603

Initials: _____

-6(MA) (0005)          Page 4 of 15     09/26/2003 3:55:08     Form 3022  1/01

A-T

32905   153

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

0053269411 -9603
Initials:_____

-6(MA) (9904).03          Page 5 of 16     09/26/2003 3:55:08      Form 3022   3/99

A-T

32905   154

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

0053269411 - 9603

Initials: _____

-6(MA) (0005)            Page 6 of 16      09/26/2003 3:55:08   Form 3022   1/01

A-T

32905   155

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

0053269411 -9603
Initials:___

VMP -6(MA) (0005)    Page 7 of 15    09/26/2003 3:55:08    Form 3022  1/01

A-T

32905  156

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

0053269411 - 9603
Initials:

-6(MA) (0005)          Page 8 of 15          09/26/2003 3:55:08     Form 3022   1/01

A·T

32905   157

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

0053269411 -9603

Initials: _____

-6(MA) (0005)          Page 9 of 15     09/26/2003 3:55:08     Form 3022   1/01

A-T

02895   158

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0053269411 -9603

Initials: _____

-6(MA) (0005)          Page 10 of 15     09/26/2003  3:55:08    Form 3022   1/01

32905   159

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

0053269411 - 9603

Initials: _____

-6(MA) (0005)          Page 11 of 15     09/26/2003 3:55:08     Form 3022   1/01

A-T

32905   160

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0053269411 - 9603

Initials: _____

-6(MA) (0005)                 Page 12 of 15      09/26/2003 3:55:08    Form 3022   1/01

A-T

32905   161

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

0053269411 - 9603

Initials:

-6(MA) (0005)          Page 13 of 15      09/26/2003 3:55:08      Form 3022   1/01

32905   162

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
ABU TAREK                        -Borrower

_____

_____ (Seal)
                                 -Borrower

_____ (Seal)
                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                 -Borrower

_____ (Seal)
                                 -Borrower

0053269411 -9603

-6(MA) (0006)

Page 14 of 15   09/26/2003 3:55:08 PM Form 3022   1/01

32905   163

**COMMONWEALTH OF MASSACHUSETTS,**          County **ss:**

On this _____ day of _____ before me personally
appeared

_____

_____

_____

to me known to be the person(s) described in and who executed the foregoing instrument, and
acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires:



Notary Public

Daniel K. Webster
NOTARY PUBLIC
My commission expires Mar. 25, 2005

|||||||||||||||||||||||

400-15MA (4/02)                    Page 15 of 15          0053269411 - 9603

09/26/2003 3:55:08 PM

32905  164

EXHIBIT A

PROPERTY ADDRESS:        Unit 11 in the 10 Jamaicaway Condominium,
                         Boston (Jamaica Plain), Massachusetts.


Unit 11 in the 10 Jamaicaway Condominium (the "Condominium"), a condominium
established by the Grantor pursuant to Massachusetts General Laws, Chapter 183A by
Master Deed dated and recorded June 7, 1984, with the Suffolk County Registry of Deeds
at Book 10962, Page 001, as amended (the "Master Deed"). The post office address of
the Unit is 10 Jamaicaway, Boston , Massachusetts. The Unit is shown on the floor plans
(the "Plans") filed simultaneously with the Master Deed in said Deeds.

*see deed herewith*

32905   165

# ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 29th day of September , 2003   and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Argent Mortgage Company, LLC (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

10 JAMAICA WAY, JAMAICA PLAIN, MA  02130
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of  7.850 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
  **(A) Change Dates**
The interest rate I will pay may change on the first day of  October, 2005  , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

  **(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal.  The most recent index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials  *A T*

Loan Number: 0053269411 - 9603

09/26/2003 3:55:08 PM

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **six and one-half** percentage points ( **6.500** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **9.850% or less than 7.850%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000** %) from the rate of interest I have been paying for the preceding   six months. My interest rate will never be greater than **13.850**)% or less than 7.850)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials  A.T

Loan Number:  0053269411 - 9603

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Abu Tarek_ _____ (Seal)   _____ (Seal)
Borrower ABU TAREK                      Borrower

_____ (Seal)   _____ (Seal)
Borrower                                 Borrower

Loan Number: 0053269411 - 9603

610-3 (Rev 1/01)                 Page 3 of 3

09/26/2003 3:55:08 PM

32905 168

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 29th day of September, 2003, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to Argent Mortgage Company, LLC

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

10 JAMAICA WAY, JAMAICA PLAIN, MA 02130

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance,

0053269411

MULTISTATE CONDOMINIUM RIDER-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-8R (0008)     Form 3140 1/01
Page 1 of 3     Initials: A·T
VMP MORTGAGE FORMS - (800)521-7291          09/26/2003 3:55:08 PM

then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

0053269411

Initials: _A T_

-8R (0008)       Page 2 of 3  09/26/2003  3:55:08 PM  Form 3140 1/01

32905   170

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_Abu Tarek_ _____(Seal)                    _____(Seal)
ABU TAREK                    -Borrower                                                   -Borrower


_____(Seal)                    _____(Seal)
                                   -Borrower                                                   -Borrower


_____(Seal)                    _____(Seal)
                                   -Borrower                                                   -Borrower


_____(Seal)                    _____(Seal)
                                   -Borrower                                                   -Borrower


0053269411

-BR (0008)                    Page 3 of 3 09/26/2003 3:55:08 PM  Form 3140 1/01

**Exhibit B**

FEB-13-2004 FRI 03:36 PM                    FAX NO.                      P. 01

FOR RESIDENTIAL PROPERTY CONSTRUCTED PRIOR TO 1978,
BUYER(S) MUST ALSO SIGN LEAD PAINT
"PROPERTY TRANSFER NOTIFICATION CERTIFICATION"

From the Office of:

**OFFER TO PURCHASE REAL ESTATE**

TO   _Owner of Record_
        (Seller and Spouse)

date  _2/11/04_

The property herein referred to is identified as follows:  _6 O Jamaicaway Unit # 11 Jamaica Plain, MA_

Special provisions (if any) re fixtures, appliances, etc.  _All Appliances and Fixtures to stay_

hereby offer to buy said property, which has been offered to me by  _J.P. LaPierre and Prudential_
_Unlimited Realty_        as the Seller's Broker(s) under the following terms and conditions:

1.  I will pay therefore $ _243,000_ , of which        CHECK ONE:
                                                         ☑ Check, subject to collection
    (a) $ _1000_  is paid herewith as a deposit to bind this Offer    ☐ Cash
    (b) $ ____  is to be paid as an additional deposit upon the execution of the Purchase and Sale Agreement provided for below.
    (c) $ _232,000_  is to be paid at the time of delivery of the Deed in cash, or by certified, cashier's, treasurer's or bank check(s).
    (d) $ _10,000_  _to be delivered on 2/14/04_
    (e) $ _243,000.00_  Total Purchase Price

2.  This Offer is good until _12_ A.M. P.M. on _2/11/04_ , 20___ at or before which time a copy hereof shall be signed by you, the Seller and your (husband) (wife), signifying acceptance of this Offer, and returned to me forthwith, otherwise this Offer shall be considered as rejected and the money deposited herewith shall be returned to me forthwith.

3.  The parties hereto shall, on or before ____ A.M. P.M. ____ , 20___ execute the applicable Standard Form Purchase and Sale Agreement recommended by the Greater Boston Real Estate Board or any form substantially similar thereto, which, when executed, shall be the agreement between the parties hereto.

4.  A good and sufficient Deed, conveying a good and clear record and marketable title shall be delivered at 12:00 Noon on _2 / 20_ , 20 _04_ at the appropriate Registry of Deeds, unless some other time and place are mutually agreed upon in writing.

5.  If I do not fulfill my obligations under this Offer, the above mentioned deposit shall forthwith become your property without recourse to either party. Said deposit shall be held by _Prudential Unlimited Realty_ as escrow agent subject to the terms hereof provided however that in the event of any disagreement between the parties, the escrow agent may retain said deposit pending instructions mutually given in writing by the parties. A similar provision shall be included in the Purchase and Sale Agreement with respect to any deposit held under its terms.

6.  Time is of the essence hereof.

7.  The initialed riders, if any, attached hereto are incorporated herein by reference. Additional terms and conditions, if any:
    _That seller fix doorlock on the escape door, repair the pipe that is broke_
    _under kitchen cabinet, secures bathroom light to wall and also repairs the_
    _back of the cabinet in kitchen. Buyer does not want Home, Pest, Lead Paint inspect_

NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.

WITNESS my hand and seal                     SIGNED ____
                                             Buyer ____
                                             Buyer ____

                                             _617 734 7240_  (home)
                                                             (work)

Address ____
This Offer is hereby accepted upon the foregoing terms and conditions at _10:30_ A.M. P.M. on _02-11-04_ , 20__
WITNESS my (our) hand(s) and seal(s)
_Aboufare R_
Seller (or spouse)                                      Seller

**Exhibit C**

## The Buyer Does Not Want To Use An Attorney

The Buyer recognizes that the real estate salesperson is not an attorney and not an expert on real estate law.

The Buyer acknowledges that the real estate salesperson has recommended to the buyer, that the buyer use an attorney when reviewing binding legal documents such as the Purchase and Sale Agreement.

Despite this, the Buyer has chosen not to use an attorney.

The buyer agrees to hold the real estate salesperson and their firm harmless from any and all damages that could have been avoided if the buyer used professional representation in the negotiation of the Purchase and Sale Agreement.

Buyer _____     Date  2/13/2004

Address of Property  10 Jamaicaway #11 Jamaica Plain, MASS

Real Estate Salesperson _____     Firm  Prudential Unlimited Realty

**Exhibit D**

**STANDARD FORM**
**PURCHASE AND SALE AGREEMENT**

This _18_ day of February, 2004

1.   **PARTIES AND**
     **MAILING ADDRESSES**

     (fill in)

Abu Tarek of 4 Commonwealth of Massachusetts, Apt. 15, Boston, Massachusetts 02116, hereinafter called the
SELLER, agrees to SELL and
Thomas Roberts of _P. O. Box 230177_
_02123_, hereinafter called the BUYER or PURCHASER, agrees to BUY, upon the terms hereinafter set forth,
the following described premises:
10 Jamaicaway, Unit #11, Jamaica Plain, Suffolk County, Massachusetts  02130.

2.   **DESCRIPTION**
     (fill in and include title
     reference)

Unit No.  11 ("the "Unit") Of The 10 Jamaicaway Condominium, Massachusetts (the "Condominium"), created
pursuant to Chapter 183A of the Massachusetts General Laws by Master Deed dated June 6, 1984, and recorded with
Suffolk County Registry of Deeds at Book 10962, Page 001, together with (a) an undivided 3.7% interest in both
common areas and facilities of the Condominium and the organization of unit owners through which the condominium
is managed and regulated, (b) exclusive right to use the parking spaces and storage room, if any, assigned to the Unit,
and (c) such other rights and easements appurtenant to the Unit as may be set forth in any documents governing the
operation of the condominium, including without limitation the Master Deed, the By-Laws of the organization of unit
owners, and any administrative rules and regulations adopted pursuant thereto (all of which are hereinafter referred to
as the Condominium Documents).  The above-described premises are those conveyed to the SELLER by deed, recorded
with Suffolk Registry of Deed in Book 32905, Page 146.

3.   **BUILDINGS,**
     **STRUCTURES,**
     **IMPROVEMENTS,**
     **FIXTURES**
     (fill in or delete)

Included in the sale, as part of the Unit, are the fixtures belonging to the SELLER, and used in connection therewith,
and _All  Appliances  and  Fixtures  to  stay_
but excluding _Nothing  is  excluded_
to the extent to which any of such fixtures belong to the SELLER may be governed in part by the provisions contained
in the Condominium Documents.

4.   **TITLE DEED**
     (fill in)
     *Include here by specific
     reference any restrictions,
     easements, rights and
     obligations in party walls
     not included in (b), leases,
     municipal and other liens,
     other encumbrances, and
     make provision to protect
     SELLER against
     BUYER'S breach of
     SELLER'S covenants in
     leases, where necessary.

Said Unit is to be conveyed by a good and sufficient quitclaim deed running to BUYER, or to the nominee designated
by BUYER by written notice to SELLER at least seven (7) days before the deed is to be delivered as herein provided,
and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except
(a)    Provisions of existing building and zoning laws;
(b)    Existing rights and obligations in party walls which are not the subject of written agreement;
(c)    Such taxes for the then current year as are not due and payable on the date of the delivery of such deed;
(d)    Any liens for municipal betterments assessed after the date of this agreement;
(e)    Easements, restrictions and reservations of record, if any, as of the date of this Agreement, so long as the same do
not, or could not be exercised in such a way so as to prohibit or materially interfere in BUYER'S reasonable opinion,
with the current use of said premises as a single family residence;
(f)    The provisions of the Act (Chapter 183A of the Massachusetts General Laws) and the Condominium documents
(any document governing the operation of the Condominium, including without limitation the Master Deed, the By-
Laws of the organization of unit owners and any administrative rules and regulations adopted pursuant thereto, as
amended, in effect now or at the date of the closing) including without limitation all obligations of the unit owners to
pay a proportionate share of the common expenses of the Condominium.

5.   **PLANS**

If said deed refers to a plan necessary to be recorded therewith SELLER shall deliver such plan with the deed in form
adequate for recording or registration.

6.   **REGISTERED**
     **TITLE**

In addition to the foregoing, if the title to said Unit is registered, said deed shall be in form sufficient to entitle BUYER
to a Certificate of Title of said Unit, and SELLER shall deliver with said deed all instruments, if any, necessary to
enable BUYER to obtain such Certificate of Title.

7.   **PURCHASE PRICE**
     (fill in); space is allowed
     to write out the amounts if
     desired

The agreed purchase price for said Unit is Two Hundred Forty Three _Thousand_ Dollars and 00/100 Cents ($243,000.00), of
which

$    0.00       have been paid as a deposit this day and
$    11,000.00      having been previously paid and
$    232,000.00      are to be paid at the time of delivery of the deed in cash, or by certified, cashier's,
                    treasurer's or bank check(s), or by conveyancer's check from BUYER's lender's attorney if
                    drawn on a Massachusetts bank.

$    243,000.00      TOTAL

**8.   TIME FOR PERFORMANCE; DELIVERY OF DEED** (fill in)

Such deed is to be delivered at 11:00 a.m. on the 20th day of February at the Suffolk County Registry of Deeds or, if required by BUYER's lender, then at the offices of BUYER's lender's counsel, unless otherwise agreed upon in writing. It is agreed that time is of the essence of this agreement.

**9.   POSSESSION AND CONDITION OF PREMISE.** (attach a list of exceptions, if any)

Full possession of said Unit free of all tenants and occupants, except as herein provided, is to be delivered at the time of the delivery of the deed, said Unit to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted, and (b) not in violation of said building and zoning laws, and (c) in compliance with provisions of any instrument referred to in clause 4 hereof; and (d) broom clean and free of debris and personal property. BUYER shall be entitled personally to enter and inspect said Unit prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.

**10.   EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM (Change period of time if desired).**

If SELLER shall be unable to give title or to make conveyance, or to deliver possession of the Unit, all as herein stipulated, or if at the time of the delivery of the deed the Unit do not conform with the provisions hereof, then any payments made under this agreement shall forthwith be refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto unless SELLER elects to shall use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said Unit conform to the provisions hereof, as the case may be, in which event SELLER shall give written notice thereof to BUYER at or before the time for performance hereunder, and thereupon the time for performance hereof shall be extended for a period of thirty (30) days. In no event shall SELLER be required to expend more than a total of $1,000.00 to clear title and deliver possession.

**11.   FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.**

If at the expiration of the extended time SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension thereof, the holder of a mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

**12.   BUYER'S ELECTION TO ACCEPT TITLE**

BUYER shall have the election, at either the original or any extended time for performance, to accept such title as SELLER can deliver to the said Unit in its then condition and to pay therefor the purchase price without deduction, in which case SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said Unit shall have been damaged by fire or casualty insured against, then SELLER shall, unless SELLER has previously restored the Unit to its former condition, either

(a) pay over or assign to BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by SELLER for any partial restoration, plus any deductible; or

(b) if a holder of a mortgage on said Unit shall not permit the insurance proceeds or a part thereof to be used to restore the said Unit to its former condition or to be so paid over or assigned, give to BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered, recoverable said retained by the holder of the said mortgage less any amounts reasonably expended by SELLER for any partial restoration, plus any deductible.

**13.   ACCEPTANCE OF DEED**

The acceptance of a deed by BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

**14.   USE OF MONEY TO CLEAR TITLE**

To enable SELLER to make conveyance as herein provided, SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded simultaneously with the delivery of said deed or provided discharges of mortgages, if any, from banks or other lending institutions are recorded within a reasonable time following delivery of the deed.

**15.   INSURANCE** *Insert amount (list additional types of insurance and amounts as agreed)

Until the delivery of the deed, SELLER shall maintain insurance on said Unit as follows:

| Type of Insurance | Amount of Coverage |
| --- | --- |
| (a) Fire and Extended Coverage | *$ As presently insured |
| (b) | *$ |

**16.   ADJUSTMENTS** (list operating expenses, if any, or attach schedule)

Collected rents, mortgage interest, water and sewer use charges, operating expenses (if any) according to the schedule attached hereto or set forth below, and taxes for the then current fiscal year, shall be apportioned and fuel value shall be adjusted, as of the day of performance of this agreement and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by BUYER at the time of delivery of the deed. Uncollected rents for the current rental period shall be apportioned if and when collected by either party.

17.   ADJUSTMENT OF UNASSESSED AND ABATED TAXES

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding fiscal year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to apportioned shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

18.   BROKER'S FEE (fill in fee with dollar amount or percentage; also name of Brokerage firm (s))

A Broker's fee for professional services of five percent (5%) of the purchase price ($ 12,150.00 ) is due from SELLER to Prudential Unlimited, the Broker herein, if and when the deed for the Property is recorded and proceeds distributed.

19.   BROKER(S) WARRANTY (fill in name)

The Broker named herein warrants that the Broker is duly licensed as such by the Commonwealth of Massachusetts.

20.   DEPOSIT (fill in name)

All deposits made hereunder shall be held in escrow in a non-interest-bearing account by Prudential Unlimited, as escrow agent subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement. In the event of any disagreement between the parties, the escrow agent shall retain all deposits made under this agreement pending instructions mutually given by SELLER and BUYER. In the event SELLER and BUYER cannot reach a mutually satisfactory resolution to any such disagreement, SELLER and BUYER shall seek a resolution in an arbitration conducted by an arbitrator duly licensed in Massachusetts. The final descison of such arbitrator shall be legally binding on both SELLER and BUYER and the costs of such arbitration shall be borne equally by the parties.

21.   BUYER'S DEFAULT; DAMAGES

If BUYER shall fail to fulfill BUYER's agreements herein, all deposits made hereunder by BUYER shall be retained by SELLER as liquidated damages unless within thirty days after the time for performance of this agreement or any extension hereof, SELLER otherwise notifies BUYER in writing.

22.   RELEASE BY HUSBAND OR WIFE

SELLER's spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said Unit.

23.   BROKER AS PARTY

The Broker(s) named herein join(s) in this Agreement and become(s) a party hereto, insofar as any provisions of this Agreement expressly apply to the Broker(s), and to any amendments or modifications of such provisions to which the Broker(s) agree(s) in writing.

24.   LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc.

If SELLER or BUYER executes this Agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, neither SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

25.   WARRANTIES AND REPRESENTATIONS (fill in); if none, state "none"; if any listed, indicate by whom each warranty or representation was made

BUYER acknowledges that BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either SELLER or the Broker(s):

NONE

26.   MORTGAGE CONTINGENCY CLAUSE (omit if not provided for in Offer to Purchase)

~~In order to help finance the acquisition of said Unit, BUYER shall apply for a conventional bank or other institutional mortgage loan of $_____ at prevailing rates, terms and conditions. If despite BUYER's diligent efforts a commitment for such loan cannot be obtained on or before _____, 2004, BUYER may terminate this agreement by written notice to SELLER and/or the Broker(s), as agent(s) for the SELLER, prior to the expiration of such time, whereupon any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto. In no event will BUYER be deemed to have used diligent efforts to obtain such commitment unless BUYER submits a complete mortgage loan application conforming to the foregoing provisions on or before _____, 2004.~~

NOT APPLICABLE.

27. CONSTRUCTION OF AGREEMENT

This instrument, executed in multiple counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and inures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both SELLER and BUYER. If two or more persons are named herein as BUYER or as SELLER, their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it.

28. LEAD PAINT LAW

The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age.

29. SMOKE DETECTORS

SELLER shall, at the time of the delivery of the deed, deliver a certificate from the fire department of the city or town in which said Unit is located stating that said Unit has been equipped with approved smoke detectors in conformity with applicable law.

30. ADDITIONAL PROVISIONS

See Rider A attached hereto and made a part hereof.

FOR RESIDENTIAL PROPERTY CONSTRUCTED PRIOR TO 1978, BUYER MUST ALSO HAVE SIGNED LEAD PAINT "PROPERTY TRANSFER NOTIFICATION CERTIFICATION"

NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.

SELLER: ABU TAREK
Social Security No.

SELLER:
Social Security No. 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

BUYER: THOMAS ROBERTS
Social Security No. 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

BUYER:
Social Security No. 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

EXTENSION OF TIME FOR PERFORMANCE

The time for the performance of the foregoing agreement is extended until __Four__ o'clock __P__ M. on the 20th day of __February__, 20 04, time still being of the essence of this agreement as extended. In all other respects, this agreement is hereby ratified and confirmed. Date 2/18/04

This extension, executed in multiple counterparts, is intended to take effect as a sealed instrument.

SELLER (or spouse)

SELLER

BUYER

BUYER

Broker(s)

Note: This Document is an adaptation of The Greater Boston Real Estate Board Standard Form Purchase and Sale Agreement

RIDER A
TO PURCHASE AND SALE AGREEMENT

SELLER:     Abu Tarek
BUYER:      Thomas Roberts
PROPERTY:   Unit 11, The 10 Jamaicaway Condominium, Jamaica Plain, Massachusetts

31. **No Broker:** The BUYER and SELLER each represent and warrant to the other that they have not dealt with any brokers or finders in connection with the purchase and sale of the Unit as provided in this Agreement or in connection with this Agreement other than Prudential Unlimited BUYER and SELLER each agrees to exonerate, indemnify and hold the other harmless from and against any and all loss, cost, damage or expense, including reasonable attorneys' fees incurred by the other as a result of either BUYER's or SELLER's misrepresentation or breach of the foregoing warranty. The provisions of this clause shall survive the closing.

and shall be deemed delivered upon the earliest to occur of (a) receipt or refusal to accept delivery; or (b) upon delivery prior to 5:00 p.m. on any business day by telecopy evidenced by written or printed receipt confirmation, provided a copy of any such notice sent by telecopy is sent also by means of one of the above-described manners of delivery. BUYER and SELLER may change the address to which any notice is to be sent by giving reasonable notice to the other party of such new address in the manner specified.

34. **BUYER's Inspection:** BUYER acknowledges that BUYER elected not to perform an inspection, or have an inspection performed, by an engineer, contractor or other person(s) engaged in the home inspection business and agrees that BUYER is purchasing the Unit in its present "AS IS" condition.

35. **Title:** BUYER agrees that at the request of BUYER, no review of title of the Unit or Condominium was performed and that BUYER is purchasing from SELLER whatever rights, title and interests SELLER may have in and to the Unit. BUYER further agrees that BUYER's obligations hereunder are expressly NOT conditioned upon title to the Unit being insurable with a nationall recognized title insurance company.

36. **No Representations to Buyer:** BUYER warrants and agrees that neither SELLER nor SELLER's attorneys have made any representation whatsoever regarding the title to the Unit or the property, the payment of any Condominium fees, taxes, charges or assessments related to the Unit or property or the conditions of the Unit or property, and that BUYER is not relying upon any such representations in BUYER's purchase of the Unit.

39. **Merger.** It is understood and agreed that (i) all contemporaneous or prior representations, statements, understandings and agreements, oral or written, between the parties are merged in this Agreement, which alone fully and completely expresses the agreement of the parties, and (ii) that this Agreement is entered into after full investigation, neither party relying on any statement or representation made by the other which is not embodied in the Agreement.

SELLER: Abu Tarek

BUYER: Thomas Roberts

**Exhibit E**

# GORDON AND BALIKIAN, LLP

535 Boylston Street, 6th Floor
Boston, Massachusetts 02116
Telephone:  617-536-1801
Facsimile:  617-536-1802

From the desk of:
**Ara J. Balikian, Esq.**
*ab@gbassociates.com*

February 20, 2004

Thomas Roberts
10 Jamaicaway, Unit 11
Jamaica Plain, MA  02130

RE:    **Unit 11 of The 10 Jamaicaway Condominium ("Property")**

Dear Mr. Roberts:

    In connection with your purchase of the above-referenced Property, this firm wishes to set forth as clearly as possible that:

1.    This firm has been retained solely by Abu Tarek, the "Seller" of the Property. We represent Mr. Tarek and only protect his interests.

2.    This firm does not represent you in your purchase of the Property in any manner. We are not in a position to give, and are not giving, you any counsel regarding your interests in connection with this transaction.

3.    This firm advises and informs you of your right to obtain counsel of your own choosing and encourages you to obtain such counsel. Your decision to proceed in this transaction without counsel has been made freely and voluntarily by you, and was not the result of threats or force by anyone.

4.    You agree that Seller, Seller's agents and this firm have made no representation regarding the status of (a) the title of or (b) any condominium fees, taxes, assessments or other charges related to the Property, and that you are not relying upon any such representations or any other representation in purchasing the Property.

5.    You agree that you are purchasing the Property in its "AS IS" condition without, among other things, an inspection of the Property or a prior survey of or review of the title to the Property.

Thomas Roberts
Date: February 20, 2004
Page 2

6.    You agree to release the Seller and this firm from any and all claims,
      demands and liabilities, in law and in equity, which you may now have
      or ever had against the Seller and this firm regarding all transactions
      involved in the sale of the Property to you.   You further agree to
      indemnify and hold the same harmless against any and all loss, costs or
      damages, including but not limited to reasonable attorneys fees, arising
      from this transaction.

7.    Only the terms and conditions contained in the Purchase and Sale
      Agreement signed by the parties, along with this letter, provide the
      understanding between the parties.

      By signing this letter below, you confirm your understanding, informed consent
and agreement to all of the foregoing and accordingly, your intent to consummate your
purchase of the Property.

      If you have any questions regarding this matter, please call.

                                          Very truly yours,


                                          Ara J. Balikian


AGREED TO AND ACCEPTED BY:


Thomas Roberts
Date: 2.20.2004

**Exhibit F**

33853   107

Return Address:
Thomas Roberts
10 Jamaicaway, #11
Jamaica Plain. MA 02130

273

Total Pages: 3



02/20/2004 Doc: 0273

## QUITCLAIM DEED

I, **ABU TAREK**,

of 4 Commonwealth Court, #15, Boston, Suffolk County, Massachusetts,

for consideration paid, and in full consideration of Two Hundred Forty Three Thousand Dollars ($243,000.00) and other good and valuable consideration,

grant to **THOMAS ROBERTS**,

of 144 Smith Street, Boston, Suffolk County, Massachusetts with

*QUITCLAIM COVENANTS,*

Unit No. 11 (the "Unit") in The 10 Jamaicaway Condominium (the "Condominium"), a condominium established pursuant to Massachusetts General Laws, Chapter 183A by Master Deed, dated June 7, 1984 and recorded at the Suffolk County Registry of Deeds in Book 10962, Page 001 (the "Master Deed"). The post office address of the Unit is 10 Jamaicaway, Boston, Massachusetts. The Unit is shown on the floor plans (the "Plans") filed simultaneously with the Master Deed with said Deeds to which is affixed the verified statement required by Section 9 of said Chapter 183A.

The Unit is conveyed together with:

1. An undivided 3.7 percent interest in the common areas and facilities (the "Common Elements") described in the Master Deed in Schedule B thereto.

2. The rights and obligations of membership in The 10 Jamaicaway Condominium Association (the "Condominium Association").

3. The right to use any common laundry facilities in accordance with the Master Deed.

4. An easement for the continuance of all encroachments by the Unit on any adjoining units or Common Elements existing as a result of construction of the building in which the Unit is located or which may come into existence hereafter as a result of settling or shifting of said building, or as a result of repair and restoration of the building or of the Unit after damage or destruction by fire or other casualty or after a taking in condemnation or eminent domain proceedings or by reason of an alteration or repair to the Common Elements made in accordance with the Master Deed and By-laws of the Condominium Association (the "By-laws").

5. An easement in common with the owners of other units and the Condominium Association to use any pipes, wires, ducts, flues, cables, conduits, public utility lines and other Common Elements located in any of the other units elsewhere in the Condominium, and serving the Unit in accordance with the Master Deed and By-laws.

33853  108

6. Such other rights and easements appurtenant to the Unit as set forth in the Master Deed and By-Laws.

The Unit is conveyed subject to:

1. Easements in favor of adjoining units and in favor of the Common Elements for the continuance of all encroachments of such adjoining units or Common Elements on the Unit which may come into existence hereafter as a result of settling or shifting of the building containing the Unit, or as a result of repair and restoration of the building or of any adjoining unit or of the Common Elements after damage or destruction by fire or other casualty or after a taking in condemnation or eminent domain proceedings or by reason of an alteration or repair to the Common Elements made in accordance with the Master Deed or By-laws.

2. Easements in favor of other units in the Condominium for the exclusive use of reserved Common Elements appurtenant to units in the Condominium as described in the Master Deed and shown on the Plans.

3. An easement in favor of other units in the Condominium to use the pipes, wires, ducts, flues, cables, conduits, public utility lines and other Common Elements located in the Unit and serving such other units in accordance with the Master Deed and By-laws.

4. The provisions of the Master Deed and the By-laws (including without limitation, all rights reserved by Sponsor in said Master Deed and By-laws) and the site plan and floor plan of the Condominium recorded simultaneously with and as part of the Master Deed, as the same may be amended from time to time by instruments duly recorded at the Suffolk County Registry of Deeds, which provisions, together with any amendments thereto, shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit, his family, tenants, servants and visitors, as though such provisions were recited and stipulated at length herein.

The building and units are intended for residential purposes. Notwithstanding the foregoing, any unit may be used for occasional other use by the then present occupant thereof to the extent permitted by local zoning ordinances and other applicable laws, and may be occupied by the owner thereof and/or his tenants and respective immediate families and/or other persons unrelated by blood or marriage.

For title, see Deed of Alan D. Humbert, Trustee of the Pondview Realty Trust #4, under declaration of trust dated July 14, 1987 and recorded at the Suffolk County Registry of Deeds in Book 13937, Page 31, dated September 26, 2003 and recorded at said Registry in Book 32905, Page 146.

33853   109

EXECUTED as a sealed instrument this 20th day of February, 2004.

_Abu Tarek_
Abu Tarek

## COMMONWEALTH OF MASSACHUSETTS

Suffolk County, ss                                          February 20, 2004

Then personally appeared the above-named Abu Tarek and acknowledged the foregoing
instrument to be his free act and deed before me,

Notary Public
My Commission Expires:

LOUIS M. ROSS
Notary Public
My Commission Expires
July 28, 2006

CANCELLED

- 3 -

**Exhibit G**

Settlement Statement — U.S. Department of Housing and Urban Development

| B. Type of Loan | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. ☐ FHA  2. ☐ FmHA  3. ☒ CONV. UNINS  4. ☐ VA  5. ☐ CONV. INS.  ☐ None | | | 6. File Number: | | 7. Loan Number: | | 8. Mortgage Ins. Case No.: |

HUD-1 (3/86) OMB No. 2502-0265

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrowers: Thomas Roberts | F. Name and Address of Lender: |
|---|---|
| 10 Jamaicaway, Unit 11<br><br>Jamaica Plain MA 02130 | |

| E. Name and Address of Sellers: Abu Tarek | H. Settlement Agent: |
|---|---|
| 4 Commonwealth Avenue, #15<br><br>Boston MA 02116 | Gordon & Belkian, LLP<br>535 Boylston Street,<br>8th Floor<br>Boston, MA 02116 |

| G. Property Location: | I. Settlement Date: | Place of Settlement: 535 Boylston Street, 8th Floor |
|---|---|---|
| 10 Jamaicaway, Unit 11<br><br>Jamaica Plain MA 02130 | February 20, 2004 | Boston, MA 02116 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| 101. Contract sales price | $243,000.00 | 401. Contract sales price | $243,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $125.00 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes to | $0.00 | 406. City/town taxes to | $0.00 |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | $0.00 | 408. Assessments to | $0.00 |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross Amount Due From Borrower | $243,125.00 | 420. Gross Amount Due To Seller | $243,000.00 |
| 200. Amounts Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | $11,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $0.00 | 502. Settlement charges to seller (line 1400) | $14,378.08 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Lender Credit to Borrower | $0.00 | 504. Payoff 1 | $0.00 |
| 205. | | 505. Payoff 2 | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes to | $0.00 | 510. City/town taxes to | $0.00 |
| 211. County taxes to | | 511. County taxes to | |
| 212. Assessments to | $0.00 | 512. Assessments to | $0.00 |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | $11,000.00 | 520. Total Reductions Amount Due Seller | $14,378.08 |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from borrower (line 120) | $243,125.00 | 601. Gross amount due to seller (line 420) | $243,000.00 |
| 302. Less amount paid by/for borrower (line 220) | ($11,000.00) | 602. Less reductions in amount due seller (line 520) | ($14,378.08) |

| 303. CASH ☒ FROM ☐ TO BORROWER: | $232,125.00 | 603. CASH ☒ TO ☐ FROM SELLER: | $228,621.92 |
|---|---|---|---|

Buyer's Initials _(initials)_        Seller's Initials _A T_

Substitute Form 1099 Seller Statement: The information contained in blocks E, G, H, and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported to the IRS and the IRS determines that is has not been reported.

Seller Instructions: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797; 6252 or Schedule D.

TIN Certification: You are required by law to provide Gordon & Belkian, LLP with your correct taxpayer identification number. If you do not provide Gordon & Belkian, LLP with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.

Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

Seller's Signature(s): _Abu Tarek (signature)_

Abu Tarek

**L. Settlement Charges**

| | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | $243,000.00 @ | 5 % = $12,150.00 | | |
| Division of Commission (line 700) as follows: | | | | | |
| 701. | $12,150.00 | to Prudential Unlimited | | | |
| 702. | | to | | | |
| 703. Commission paid at Settlement | | | | | |
| 704. | | | | | $12,150.00 |
| **800. Items Payable in Connection With Loan** | | | | | |
| 801. Loan Origination Fee | | % | | | |
| 802. Loan Discount | | % | | | |
| 803. Appraisal Fee | | | | | |
| 804. Credit Report | | | | | |
| 805. Lender's Inspection Fee | | | | | |
| 806. Mortgage Insurance Application Fee | | | | | |
| 807. Assumption Fee | | | | | |
| 808. Flood Certification | | | | | |
| 809. | | | | | |
| 810. | | | | | |
| 811. | | | | | |
| 812. | | | | | |
| 813. | | | | | |
| 814. | | | | | |
| 815. | | | | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | | | |
| 901. Interest from | | to | @ $ | /day | |
| 902. Mortgage Insurance Premium for | | mo. to | | | |
| 903. Hazard Insurance Premium for | | yrs. to | | | |
| 904. | | | | | |
| **1000. Reserves Deposited With Lender** | | | | | |
| 1001. Hazard Insurance | | months @ | per month | | |
| 1002. Mortgage Insurance | | months @ | per month | | |
| 1003. City property taxes | | months @ | per month | | |
| 1004. | | months @ | per month | | |
| 1005. | | months @ | per month | | |
| 1006. | | months @ | per month | | |
| 1007. | | months @ | per month | | |
| 1008. Aggregate Adjustment | | | | | |
| **1100. Title Charges** | | | | | |
| 1101. Settlement or closing fee to | | Gordon & Balikian, LLP | | | $200.00 |
| 1102. Abstract or title search to | | | | | |
| 1103. Title examination to | | | | | |
| 1104. Title insurance binder to | | | | | |
| 1105. Document preparation to | | Gordon & Balikian, LLP | | | $95.00 |
| 1106. Notary fees to | | | | | |
| 1107. Attorney's fees to | | Gordon & Balikian, LLP | | | $825.00 |
| (includes above item Numbers: | | | | | |
| 1108. Title Insurance to | | First American Title Insurance Company | | $0.00 | $0.00 |
| (includes above item Numbers: | | | | | |
| 1109. Lender's coverage | $0.00 | Loan Premium: | $0.00 | | |
| 1110. Owner's coverage | $243,000.00 | Owner's Premium: | $0.00 | | |
| 1111. | | | | | |
| 1112. | | | | | |
| 1113. Title Insurance Commission to Title Agent | | $0.00 | 70 % | | |
| **1200. Government Recording and Transfer Charges** | | | | | |
| 1201. Recording fees: | Deed $125.00 | Mortgage | Releases | $125.00 | $0.00 |
| 1202. City/county tax stamps: | Deed | Mortgage | | | |
| 1203. State tax/stamps: | Deed $1,108.08 | Mortgage | | $0.00 | $1,108.08 |
| 1204. | | | | | |
| **1300. Additional Settlement Charges** | | | | | |
| 1301. Survey to | | | | | |
| 1302. Pest inspection to | | | | | |
| 1303. | | | | | |
| 1304. | | | | | |
| 1305. | | | | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | | | $125.00 | $14,378.08 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement (pages 1 and 2).

Borrowers                                                          Sellers

Thomas Roberts                                                Abu Tarek

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent          Gordon & Balikian, LLP                          Date          February 20, 2004

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**Exhibit H**

2007 00128296
Bk: 42771 Pg: 68   Doc: AST
Page: 1 of 1   11/28/2007 09:55 AM

**ASSIGNMENT**

Argent Mortgage Company, LLC

holder of mortgage from

Abu Tarek

*Attested hereto*
*Francis M. Roache*
*Register of Deeds*

to Argent Mortgage Company, LLC

dated September 29, 2003

recorded with Suffolk County Registry of Deeds
Book 32905, Page 149.  assigns said mortgage and the note and claim

Secured thereby to Deutsche Bank National Trust Company, as Trustee of Argent Securities Inc., Asset Backed Pass-Through Certificates, Series 2003- W7 Under the Pooling and Servicing Agreement Dated as of November 1, 2003, without recourse, 10801 6th Street, Suite 130, Rancho Cucamonga, CA 91730

In witness whereof the said Argent Mortgage Company, LLC

Has caused its corporate seal to be hereto affixed and these presents to be signed, in its name and behalf by

Dawn L Reynolds  its  Authorized Agent

This  24  day of September 2007

Argent Mortgage Company, LLC By AMC
Mortgage Services, Inc. As Authorized Agent.

BY: _Dawn L Reynolds_
Dawn L. Reynolds, Authorized Agent

STATE OF CALIFORNIA            )
                                                      ) ss.
COUNTY OF SAN BERNARDINO  )

On this 24 day of September 2007, before me, the undersigned notary public, personally appeared Dawn L. Reynolds who I have personal knowledge of identity, to be the person whose name is signed on the proceeding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

Official Signature and Seal of Notary
My Commission Expires: _____

File No. 214.6484



VINCENT B. AYALA
Commission # 1761748
Notary Public - California
San Bernardino County
My Comm. Expires Aug 16, 2011

**Orlans Moran PLLC**
**P.O. Box 962169**
**Boston, MA  02196**

**Exhibit I**

COMMONWEALTH OF MASSACHUSETTS
LAND COURT
DEPARTMENT OF THE TRIAL COURT

(LET JUDGMENT ISSUE:

Land
Court
Use
Only

*Jason J. Scheier*

*Chief* Justice

Suffolk, ss.

Case No. 07 MISC 361107

## COMPLAINT TO FORECLOSE MORTGAGE

PLAINTIFF:
Name

City or Town
of Residence

Deutsche Bank National Trust Company, as Trustee
of Argent Securities Inc., Asset Backed Pass-
Through Certificates, Series 2003- W7 Under the
Pooling and Servicing Agreement as of November
1, 2003, without recourse

Rancho Cucamonga,
CA

Bk: 43526 Pg: 348
Page: 1 of 1  05/14/2008 12:50 PM
Doc: JGMT

DEFENDANT:
Name

City or Town
of Residence

Interest

Thomas Roberts

Boston

owner

1.    Your Plaintiff is the owner (or assignee) and holder of a mortgage with the statutory
      power of sale given by Abu Tarek

to Argent Mortgage Company, LLC

dated September 29, 2003

Recorded with the Suffolk County Registry of Deeds at Book 32905, Page 149

The 10 Jamaicaway Condominium

covering*    10 Jamaicaway, Unit #11

Boston (Jamaica Plain District)

(street and number)

(and city and town)

and more particularly described in said mortgage.

(Unit No. and Condo.
Name if a Condominium)

*Attested hereto*
*Francis M. Roache*
*Register of Deeds*

## LAND COURT USE ONLY

### JUDGMENT

Under the provisions of the Servicemembers Civil Relief Act, this cause came on to be heard and
thereupon, upon consideration thereof, it appearing to the Court that the record owner is not entitled to the
benefits of said Act, it is

ORDERED and ADJUDGED that the plaintiff be authorized and empowered to make an entry and
to sell the property covered by the mortgage as set forth in this complaint in accordance with the powers
contained in said mortgage.

By the Court.
    Attest: ✓

A TRUE COPY
ATTEST:
Deborah J. Patterson
RECORDER

Deborah J. Patterson
*Recorder*

(SEAL)
NOTE:    Wherever the singular is used herein, it shall be deemed to mean and include the plural where applicable...
    *A metes and bounds description of the property is not necessary.

2008 00008779
Bk: 43022 Pg: 95    Doc: ORD
Page: 1 of 1    01/29/2008 09:19 AM

(SEAL)

# COMMONWEALTH OF MASSACHUSETTS
## LAND COURT
### DEPARTMENT OF THE TRIAL COURT

07 MISC 361107

To:

Thomas Roberts;

and to all persons entitled to the benefit of the Servicemembers Civil Relief Act:

Deutsche Bank National Trust Company, as Trustee of Argent Securities Inc., Asset Backed Pass-Through Certificates, Series 2003- W7 Under the Pooling and Servicing Agreement as of November 1, 2003, without recourse

| claiming to be the holder of covering real | mortgage property in Boston (Jamaica Plain District), numbered 10 Jamaicaway, Unit #11 The 10 Jamaicaway Condominium |
|---|---|

given by Abu Tarek to Argent Mortgage Company, LLC, dated September 29, 2003, Recorded with the Suffolk County Registry of Deeds at Book 32905, Page 149, and now held by plaintiff by assignment

has filed with said court a complaint for authority to foreclose said mortgage

in the manner following:  by entry and possession and exercise of power of sale.

If you are entitled to the benefits of the Servicemembers Civil Relief Act and you object to such foreclosure you or your attorney should file a written appearance and answer in said court at Boston on or before **MAR 0 3 2008**

or you may be forever barred from claiming that such foreclosure is invalid under said act.

Witness,  KARYN F. SCHEIER Chief Justice of said Court on   **JAN 1 5 2008**

Attest:

A TRUE COPY
ATTEST:

*Deborah J. Patterson*

RECORDER

Orlans Moran, PLLC
P.O. Box 962169

Deborah J. Patterson
*Recorder*

Attested hereto

*Francis M. Roache*
Francis M. Roache
Register of Deeds

72547,

**Exhibit J**

2008 00047732
Bk: 43528 Pg: 350   Doc: EOP
Page: 1 of 1   05/14/2008 12:50 PM

## CERTIFICATE OF ENTRY

We hereby certify that on the 13th day of March, Two Thousand Eight,

we were present and saw *Timothy Dibble*

an agent of Orlans Moran PLLC

a duly authorized Attorney-In-Fact of

Deutsche Bank National Trust Company, as Trustee of Argent Securities Inc., Asset Backed Pass-Through Certificates, Series 2003- W7 Under the Pooling and Servicing Agreement as of November 1, 2003, without recourse

the present holder of certain mortgage given by

Abu Tarek

to  Argent Mortgage Company, LLC

dated September 29, 2003, Recorded with the Suffolk County Registry of Deeds at Book 32905, Page 149
make an open, peaceable and unopposed entry on the premises, described in said mortgage for the purpose, then declared, of foreclosing said mortgage for breach of conditions thereof.

*C. Mahoney*
Signed

*C. MAHONEY*
Printed

*Robt Levine*
Signed

*Robt Levine*
Printed

Commonwealth of Massachusetts

Suffolk, ss

March 13, 2008

On this 13th day of March, 2008, before me, the undersigned Notary Public, personally appeared *Charles Mahoney* and *Robert Levine.*, proved to me through satisfactory evidence of identification, which were *Drive License* to be the person(s) whose name(s) is/are signed on the preceding or attached document, and acknowledged to me that they signed it voluntarily for its stated purpose.

Official Signature and Seal of Notary

**Exhibit K**

2008 00047733
Bk: 43527 Pg: 1     Doc: FDD
Page: 1 of 4     05/14/2008 12:50 PM

FORECLOSURE DEED

Deutsche Bank National Trust Company, as Trustee of Argent Securities Inc., Asset
Backed Pass-Through Certificates, Series 2003- W7 Under the Pooling and Servicing
Agreement as of November 1, 2003, without recourse, having its usual place of business
c/o Citi Residential Lending, Inc., 10801 6th Street, Suite 130, Rancho Cucamonga, CA,
91730.

the present holder of a mortgage

from Abu Tarek
to Argent Mortgage Company, LLC
dated September 29, 2003

recorded with the Suffolk County Registry of Deeds at Book 32905, Page 149, by the
power conferred by said mortgage and by every other power, for ONE HUNDRED
NINETY NINE THOUSAND THREE HUNDRED NINETY THREE DOLLARS AND
27/100 ($199,393.27) paid, grants to Deutsche Bank National Trust Company, as Trustee
of Argent Securities Inc., Asset Backed Pass-Through Certificates, Series 2003- W7
Under the Pooling and Servicing Agreement as of November 1, 2003, without recourse,
10801 6th Street, Suite 130 Rancho Cucamonga, CA, 91730,

the premises conveyed by said mortgage.

*Attested hereto*
*Francis M. Roache*
*Register of Deeds*

Executed as a sealed instrument this 9th day of May, 2008.

See Power of Attorney recorded herewith.

Deutsche Bank National Trust Company, as
Trustee of Argent Securities Inc., Asset Backed
Pass-Through Certificates, Series 2003- W7
Under the Pooling and Servicing Agreement as
of November 1, 2003, without recourse
By Orlans Moran, PLLC
Its Attorney-in-fact

By: _____
Julie Moran, Member and Authorized
Signatory, Real Estate

MASSACHUSETTS EXCISE TAX
Suffolk County
Date: 05/14/2008 12:50 PM
Ctrl# 083338 01421 Doc# 00047733
Fee: $909.72 Cons: $199,393.27

*Affidavit*

Orlans Moran PLLC, under the pains and penalties of perjury on oath deposes and says
that it does not have knowledge of revocation or termination of the Power of Attorney by
the principal or by termination of the existence of the principal.

Orlans Moran PLLC

By: _____
Julie Moran, Member and
Authorized Signatory, Real
Estate

RE: 10 JAMAICAWAY, UNIT #11, JAMAICA PLAIN, MA

*COMMONWEALTH OF MASSACHUSETTS*

SUFFOLK, SS                                        MAY 9, 2008

On this 9th day of May, 2008, before me, the undersigned notary public, personally appeared Julie Moran, Member and Authorized Signatory, Real Estate, of Orlans Moran PLLC, attorney-in-fact for Deutsche Bank National Trust Company, as Trustee of Argent Securities Inc., Asset Backed Pass-Through Certificates, Series 2003- W7 Under the Pooling and Servicing Agreement as of November 1, 2003, without recourse proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

Jessica Rodger, Notary Public
My Commission Expires:1/28/2011

Return to:
Orlans Moran PLLC
P.O. Box 962169
Boston, MA 02196
File Number: 214.6484

JESSICA RODGER
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES 01/28/2011

*Mortgagee's Affidavit*

I, Julie Moran, Member and Authorized Signatory, Real Estate of Orlans Moran PLLC under Power of Attorney for Deutsche Bank National Trust Company, as Trustee of Argent Securities Inc., Asset Backed Pass-Through Certificates, Series 2003- W7 Under the Pooling and Servicing Agreement as of November 1, 2003, without recourse ("Lender") named in the foregoing deed, make oath and say that the principal, interest and other obligations mentioned in mortgage from above referred to were not paid or tendered or performed when due or prior to the sale, and that I caused to be published on the 4th day of February, 2008, on the 11th day of February, 2008, and on the 18th day of February, 2008, in the Boston Globe a newspaper published or by its title page purporting to be published in Boston and circulated in Jamaica Plain, a notice, a true copy of which is attached hereto as Exhibit A.

I also have complied with Chapter 244, Section 14 of Massachusetts General Laws, as amended, by mailing the required notices by certified mail, return receipt requested, _____ (if checked) I also gave the Internal Revenue Service notice by mailing Notice of Sale pursuant to Section 7425( c ) of the Internal Revenue Code.

Pursuant to said notice at the time and place therein appointed,

The Lender sold the mortgage premises at public auction by Terryanne St. Pierre, a licensed auctioneer, of Tache Auctions & Sales Inc. to Deutsche Bank National Trust Company, as Trustee of Argent Securities Inc., Asset Backed Pass-Through Certificates, Series 2003- W7 Under the Pooling and Servicing Agreement as of November 1, 2003, without recourse, (highest bidder), for ONE HUNDRED NINETY NINE THOUSAND THREE HUNDRED NINETY THREE DOLLARS AND 27/100 ($199,393.27), being the highest bid made therefore at said auction.

Julie Moran, Member and Authorized
Signatory, Real Estate

*COMMONWEALTH OF MASSACHUSETTS*

SUFFOLK, SS                                             MAY 9, 2008

On this 9th day of May, 2008, before me, the undersigned notary public, personally appeared Julie Moran, Member and Authorized Signatory, Real Estate, of Orlans Moran PLLC proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

Jessica Rodger, Notary Public
My Commission Expires:1/28/2011

Return to:
Orlans Moran PLLC
P.O. Box 962169
Boston, MA 02196
File Number: 214.6484

JESSICA RODGER
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES 01-28-2011

RE: 10 JAMAICAWAY, UNIT #11, JAMAICA PLAIN, MA

EXHIBIT "A"

ATTACHED TO AND FORMING A PART OF FORECLOSURE DEED AND
AFFIDAVIT IN LAND COURT CASE NO. 361107 FOR PROPERTY LOCATED AT
10 JAMAICAWAY, UNIT #11, JAMAICA PLAIN, MA 02130

RE: 10 JAMAICAWAY, UNIT #11, JAMAICA PLAIN, MA



Return to:
Orlans Moran PLLC
P.O. Box 962169
Boston, MA 02196
File Number: 214.6484